UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------- ---------------- --------------------

TAFT KELLY,

     Plaintiff,

     v.                              Civil Action No. 1:09-cv-00703-JEB/JF

RAY LAHOOD,
  Secretary, Department of Transportation

     Defendant.

------------------ ---------------------- --------------

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO AGENCY
MOTION FOR SUMMARY JUDGMENT

The Agency filed its motion for summary judgment claiming that based on the 134 numbered assertions of undisputed fact, there are no material facts genuinely in dispute and that it is therefore entitled to judgment as a matter of law.   Plaintiff will demonstrate in its separate Plaintiff's Response to Defendant's Statement of Undisputed Facts that the vast majority of facts asserted to be undisputed are actually very much in dispute and require a hearing.    Here is a brief listing of the salient facts in dispute that require resolution by a jury after trial:

**I.  Brief Statement of Material Facts Genuinely in Dispute**

     1.   Defendant claims that Plaintiff "adopted a defiant and uncooperative approach" to Miller directives after he became Field Administrator in June 2006, citing McMurray deposition testimony. Def. Br.  p. 2.  Plaintiff denies that he was defiant and

1

uncooperative and cites to several examples where Miller sought to get his African American staff in trouble without any support for his allegations. Plaintiff Dec. para 7, n.8.

2.   Defendant asserts that problems with Plaintiff's performance came up during a routine federal program review that was conducted in September 2006.  Id.   However, this is pretextual because the results of the review were not even assembled until December 2006.  5/10/10 Swift Depo at Tr. 32 line 14.  Attachment 15 to Pl.  Dec.;  also para 15 of Pl Dec.  Yet, Miller lowered Plaintiff's performance review in August 2006 and sought guidance on how to remove him as division administrator by November, 2006, well in advance of the program review results being known.  Pl.  Dec. para 13-14.

3.   Defendant claims the program review results revealed numerous serious deficiencies that required corrective action. Def. Br. pp 2-3.  However, the person conducting the review, Danny Swift, testified that the problems that were identified for DC were "similar" to other divisions and he could not remember any specifically and none that were unique to the DC division.  3/07/08 Depo at Tr. 35, next to last line.  "… the DC office review was the first time that my people became aware of these mandated recommendations [from headquarters],  and we let not only DC division office know, but other division offices."Id. Tr. 37, 2nd para.    Attachment 15 to Plaintiff's Dec.

4.   Defendant claims that it was applying the same standards to the DC division as other divisions.  Def. Memo at p. 3.   However, Swift admitted during his 5/5/10 deposition that only the DC division got cited for errors. Id. Tr. 113 ls 17-18;  there were no error reports assembled for other divisions—Tr. 106 at ls 19-20-- the DC division was the only one required to submit their work to ESC before inputting it into the agency data

systems—Id. at Tr. 107;  Swift also admitted that the "errors" identified for DC were in fact because they were retroatively applying the newly announced policies only to the DC office retroactively:  "So I guess you could say that it was in fact, for DC, retroactively applied." Id. Tr. 113.  ls 5-7  Q:  "And only D.C. got cited for the errors, prior to the time the notice went out?  A:  "That would be a true statement."  Id. at 113 ls 17-19. Attachment 15 to Plaintiff's Dec.

    5.  Defendant claims that Miller did no more than grant Plaintiff's request to being relieved of having to perform new entrrance audits for Southern Maryland.   Def. brief pp. 5-6.   However, after Miller transferred Hanley to New England in August, Plaintiff only requested to be relieved of performing the new entrance audits for Southern Maryland because Hanley was performing many of these new entry audits.   Plaintiff did not ask to be relieved of performing compliance reviews on existing operations in that same area which was where most of DC operators ran their operations.   Pl Dec. at para 25.  It made no economic sense to transfer the enforcement work back to Baltimore, where it would require safety inspectors to travel overnight, but Plaintiff recognized that Miller would use this as an excuse to reduce his staff, which Miller later did.  Id.

    6.  Defendant claims that Plaintiff's poor performance led to his receiving a "minimally satisfactory" for PY 2007.  Def. Br.  pp. 6-7.   However, Plaintiff maintains that he accomplished all his PY 2007 goals and was being faulted for alleged "errors" which were only being cited against the DC division, most of which related to new interpretations of rules by the ESC which they were then applying retroactively against the DC division—and only the DC Division.   Same citations as 4 above.

7.  Defendant claims that Plaintiff interfered with audit of DC divisions' grant management activities.  Def. Br. pp. 7-8.   Plaintiff adamantly denies doing anything to interfere with the audit and provides declarations from all involved that he cooperated fully.  Pl Dec para 21-22; attachments 30  (McWay declaration); attach 31 (Williams declaration);  see also Brooks email at Def. H. p. 7 thanking Plaintiff for his staff's cooperation and accommodation.   Plaintiff maintains that Hartman insisted on retrieving all grant files in order to intimidate him into voluntarily relinquishing his position.  Pl. Dec at para 22.

8.  Defendant maintains that Poyer was selected as Service Center Director because he was best objective candidate on KSAs of position.   Def. Br. pp. 11-12. However,  Plaintiff maintains that he was objectively far more qualified than Poyer for position, but was scored lowly by Miller's hand picked interview panel and was scored lowly by Miller on his application because Miller did not want to work with Plaintiff. Pl Dec. para 17.   Plaintiff further maintains that Miller intentionally did not follow the agency's required selection procedures in order to select the person that he wanted for the position—Poyer.  Pl Dec. at para 18.  Although the agency's selection procedures required a diversified selection panel, Miller selected all Caucasian males who were very close to and who had selected him for the position he was in.  Id.  Miller's hand picked panel scored Plaintiff pretextually low for responses which showed that he not only understood the agency's mission but was performing the safety mission at a very high degree and the same group scored Poyer high just for knowing what goals the Agency set for the position even though never having any experience in enforcement work.  Id.

9. Defendant maintains that Miller's proposed suspension of Plaintiff for 7 days was because of Plaintiff's disregard of instructions and failure to follow Miller's directives.   Plaintiff maintains that Miller's proposed suspension was totally pretextual. Pl. Dec. at para 26-29.  Plaintiff had changed the evaluations of his staff as directed and was never instructed not to ask a question about why Miller was assuming responsibility for evaluating Plaintiff's staff when he knew nothing about their performance plans for the year.  Id  Even Hartman could not find support for one of the two specifications which Miller cited  to support such a stiff penalty and reduced the suspension to 5 days, the longest suspension he ever upheld.  Id at para 29.   Miller issued Barbara Webb Edwards only a counseling when she twice refused to change her subordinates evaluations, which is further evidence of disparate treatment.  Id.

10. Defendant maintains that Plaintiff was placed on PIP and issued an unsatisfactory PY2008 rating because of poor work performance.  Def. Br. pp. 15-17. Plaintiff maintains that Miller, through his agent Poyer who Miller assigned to administer the PIP, was applying new interpretations by Miller and the ESC against the DC Division in order to support "error" findings that no other division was held to.   Pl Dec para 31; deposition of Poyer at Attach 36.   Poyer also admitted to citing Plaintiff's divisions for errors that were being applied retroactively and for citing errors for work that was completed way in advance of the start of the PIP period for which he was supposed to be evaluating Plaintiff's division.   Id.

11. Defendant maintains that Poyer's report led to Miller issuing Plaintiff an unsatisfactory rating and reassignment to his current Office of Civil Right's position.  Def

Br. pp. 17-18.   However, Plaintiff maintains that Poyer's entire report was a hatchet job —see 10 above—and that Miller was following through on his plan of preparing a paper trail to get rid of Plaintiff for discriminatory and retaliatory reasons.   Miller attempted to beef up the Poyer report by adding some grant administration allegations, but the Agency's HR director persuaded him that those allegations were already determined to be problematic.   Attach 38 to Pl Dec., Dinep's email to Miller urging him not to add the grant administrations allegations.   Hartman admitted that he had not seen the Poyer report at the time that he gave Plaintiff his unsatisfactory rating even though the report is referred to as being attached.   It took Hartman a week to get Plaintiff the Poyer report. Plaintiff Dec. para 33;   Attachment 37.

12.   Defendant claims that Plaintiff's poor performance during the PIP and unsatisfactory rating led to his involuntary lateral reassignment to the Office of Civil Rights.   Def. Br. pp. 18-19.   Plaintiff maintains that Hartman and McMurray were discussing his permanent reassignment as early as November 2007 and that the PIP and PY 2008 results were simply used as the paper support for the reassignment in February 2009.   Pl Dec. 34.   Hartman had urged Plaintiff to voluntarily relinquish his position at the time of the grant file abduction under the threat that "You know they are going to find something."   Pl Dec. at para 22.

13.   Defendant maintains that Plaintiff did not timely exhaust the administrative process because he did not file within 45 days of his adverse actions.   Def. Br. pp. 25-27. However,  Plaintiff timely sought to complain about each of the adverse actions within 45 days of when they occurred by sending emails to the Agency's Civil Rights office.   Pl Dec. n. 9 and attachment 17.   Undersigned counsel had to eventually complain to the

Supervisory Law Judge at the Equal Employment Opportunity Commission about the agency's failure to process the complaints.  Id.  Shortly thereafter the agency agreed to consolidate all the complaints for investigation and never challenged their being untimely.  Id.

     **Introduction and Overview**:  Defendant attempts to portray the Agency as taking the various adverse actions in issue against Plaintiff based on his objective failure to perform his duties in a satisfactory manner.   However, the well developed record in this case reflects a very different motivation for Mr. Miller destroying the long time exemplary career of the DC Division Administrator —race discrimination and retaliation. Even Plaintiff's third level supervisor, Rose McMurray, reported to the EEO Counselor that Plaintiff had been a well respected division head for many years with an exemplary record of performance prior to Mr. Robert Miller being selected to be Eastern Service Center position.  Pl Dec. para 3, attach 3 EEO Counselor's summary of McMurray's comments.  She attributes Plaintiff's downfall to his being unable to accept Miller's new directives and management style but offers no specifics to support that impression. Id.; also see McMurray's 5/5/10 Depo Tr. 12.   Instead, the record is replete with examples of hostility by Mr. Miller, after barely starting in his new ESC position, reflecting a hostile predisposition against Plaintiff and his nearly all African American staff that can only be attributed to racial animosity and retaliation.

     Plaintiff and his subordinates offer several examples of Mr. Miller's tangible hostility toward them during the first few months of his taking over the ESC head position.   Several times he sought to challenge the integrity and competence of the

African American DC office staff, even before he was ever introduced to them.   On the other hand, he treated the sole Caucasian  DC employee—Steve Hanley—with a deference not justified by his few months experience in the position, even seeking to elicit negative information about Plaintiff's management style from him during a private meeting.  Even Mr. Hanley thought that so bizarre that he told Plaintiff about it.

Although Plaintiff had nearly 20 years of consistent accolades from ten consecutive different supervisors and had received numerous awards for improving the safety performance of the DC office, Miller lowered Plaintiff's end of year 2006 performance evaluation to "fully achieved" with less than 90 days of experience actively supervising him—and even before ever visiting his office once, although it was the closest division office to his ESC office.   Miller claimed that the lower rating was supported by objective data provided by his Enforcement head, Danny Swift.  However Mr. Swift has denied that there were any unusual performance problems in the DC office. Pl Dec. 15, attach 15.

Mr. Miller's animosity toward Plaintiff was so great that he was seeking advice from the SES head of Human Resources, Marlene Thomas, on how to get rid of Plaintiff within weeks after presenting Plaintiff with a fully achieved performance evaluation. Miller's supervisor, Hartman, was a co-conspirator in trying to coerce Plaintiff from his position by openly telling Plaintiff that he should seek employment elsewhere and threatening that they would find something in his grant files if he did not voluntarily relinquish his division administrator position.  We will demonstrate that Defendant spent the past 4 years building a paper trail of pretextual discipline to justify removing Plaintiff

from the position that he loved and performed so well in and was not willing to voluntarily relinquish despite the agency's efforts at intimidation.

**Brief Factual Background and Identification of Material Factual Disputes**

Plaintiff has worked for the Agency 24 years and, up until Miller became his boss, he was given good performance evaluations every year accompanied with awards every single year.   Plaintiff's last supervisor, Muscaro, described him as doing either "excellent" or "outstanding" work in his last two performance appraisals.  Both years— 2004 and 2005-- he received substantial performance awards from Muscaro.   There is not a negative comment about Plaintiff's performance in either evaluation.  Plaintiff's Dec. at   para 3.

After Mr. Muscaro retired in January 2006, Miller was eventually selected to replace him.   However, he actually did not relocate to the Eastern Service Center (ESC) until mid-June 2006.   Although the DC division is one of the closest divisions to the Glen Burnie, MD ESC, Miller visited nearly all the division offices prior to ever visiting DC.   The DC division is the only division that was staffed primarily by African Americans—with the exception of Safety Investigator Steve Hanley (Caucasian), who Plaintiff hired and had been working in the DC office.  Plaintiff's Dec.  para 4.

Miller actively supervised Plaintiff for only 74 days before the end of the 2005 PY which ends on 6/30/06. Pl Dec. at para 5.  During that 74 day period, Plaintiff never met with Miller on a single occasion.  All communications were either by phone or internet. Id. Plaintiff was directed to meet Miller at the ESC office on 8/21/06 to receive his end of year performance year (PY) evaluation. Id.  Plaintiff changed his scheduled days off to be able to make the meeting.   Plaintiff prepared his list of accomplishments

for the year comparing his achievements against his performance plan which he had sent to Miller by email ahead of the meeting, but Miller gave no indication that he had even reviewed it. Id. Miller made some comments to Plaintiff that he delegated too much, that he needed to improve on financial management, and then he handed Plaintiff the "Achieved Results" overall rating. Id. Plaintiff reviewed it and questioned Miller on where he received the information on which he based the rating. Miller responded that he had "sources". Id. Miller then directed Plaintiff to sign and backdate the evaluation to 8/18/06. Plaintiff did as directed. Plaintiff was expecting to be provided a copy, but Miller told him that he would send him the rating electronically. Plaintiff did not see any pages containing scoring based on the elements of his plan, but the rating he eventually received contained scoring pages. Id. Plaintiff spent the next three months actively seeking to get a written copy of his end of year performance appraisal at the same time that he was making inquiries with the EEOC office if he had a basis for initiating a complaint. Id. at para 6.

1. **Plaintiff disputes that he "adopted a defiant and uncooperative approach to directives Miller applied to the DC Division."** Ag. Memo, p. 2.

The agency cites to not a single shred of evidence for the assertion quoted above. During his deposition, Miller could only cite to Plaintiff not using his newly established policy for seeking leave approval for the first couple of occasions when Plaintiff sought leave.[1] Nor did the Federal Program Review have anything to do with Plaintiff's performance during this period. Enforcement Head Danny Swift, who prepared the

---

[1] Miller admitted that after reminding Plaintiff about the new procedure, he adhered to it thereafter. This seems hardly evidence of defiance on Plaintiff's part.

program review results,  testified that they were not even assembled until December 2006.  5/5/10 Swift Depo at Tr. 32.  Pl. Dec. para 11;  attach 15.

Clearly the agency cites to no actual evidence that would support the claim that Plaintiff's attitude is what led to the less favorable evaluation on 8/21/06.    Plaintiff testified that he was faced with several challenges from Miller who was constantly attempting to get his African American staff members in trouble, but even these incidents occurred after his 8/21/06 evaluation meeting with Miller. Pl Dec. at footnote 8.  The Agency has offered not a shred of evidence supporting the lowered "achieved results" rating given to Plaintiff, which led to Plaintiff given a lower performance award for the year.


**2.  Agency's Claim That DC's Poor Performance During Program Review Lead to Special Scrutiny Given DC Division Not Supported by Record Evidence**

The agency's assertion that DC's poor performance on federal program review lead to the DC division getting special scrutiny from ESC—Ag Memo p. 3-- is not supported by record evidence.

Swift testified that he was the one who prepared the federal program review results and that they were not completed until the end of 2006 and were not put into written form until early 2007. Pl Dec. attach 15.   Swift also admitted that the DC divisions results were very "similar" to what other divisions were showing and he could not remember anything significant in terms of DC committing serious errors of any type. .  3/07/08 Depo at Tr. 35, next to last line. Pl Dec attachment 15.   Clearly, Miller's decision to have ESC review every piece of work that was turned out by DC investigators was a decision he made for other reasons than those offered by the agency.

The record does contain evidence of Miller's motivation for the microscopic review of the DC division's work though and it comes in the form of what others were reporting to Plaintiff contemporaneously.   Plaintiff describes receiving phone calls and emails from subordinates and colleagues that were very revealing of motivation:

--November 16, 2006--Plaintiff received the first such communication the day before meeting with Miller on his 8/21/06 "achieved results" rating. Pl Dec. para 11. Ellise Griffin, one of the two safety investigators reporting to Plaintiff,  described having a conversation on 11/15/06 with the Hazardous Materials Specialist working at the ESC, Tony Kryfka (Caucasian), who works in the same office as Miller and Swift, and she provided a summary of the conversation by email. Id. attach 10.   According to Griffin, Kryfka asserted that Miller was out to get rid of the division administrators from four offices—all but one headed by African Americans (these are the only three divisions headed by African Americans out of the 51 offices throughout the country). Id.  Kryfka asserted that Muscaro was afraid of discrimination complaints, but that Miller was smart and would thoroughly document the reasons for getting rid of these division administrators.  Id.

--About two weeks after his 11/17/06 meeting with Miller, Plaintiff testified that he received another call this time from, Curtis Thomas, who is division administrator from South Carolina, regarding a phone call  that he had with a high management official on 11/28/06, Marlene Thomas (African American), who was at SES level and over agency Human Resources. Pl dec. para 13;   attachment 13.  According to what Thomas reported, he was told by Marlene Thomas that she had been approached by Miller

seeking to get rid of Plaintiff and wanting to get advice on what kind of documentation he would need to do so.  Id.

The Agency claims that the Federal Program Review results showed numerous problems with the DC Divisions compliance reviews including accuracy, timeliness and following policies and procedures.  Ag SJ Memo p. 3.   However Swift admitted in his deposition that DC was not showing any greater problems than other divisions and many of the discrepancies noted were because Miller implemented new procedures which he was applying to the CR's that were processed about these new procedures were established. .  3/07/08 Depo at Tr. 35, next to last line.  Pl Dec. attach 15.

### 3.   Miller Discriminatorily Reduces Plaintiff's 2006 Performance Evaluation to "Achieved Results"

The Agency claims that Miller got his information about Plaintiff's performance for his 2006 rating from various program managers.   But despite repeated requests for such information, the only information provided during discovery was that Mr. Swift was the source of the information that Miller relied upon.   Swift, however, denied giving any input to Miller other than relating to enforcement activity that he was associated with concerning the DC division.   Swift admitted that any problems with DC enforcement activity were about the same as for other divisions within the ESC. Id.

Plaintiff maintains that the DC has regularly been given awards for its active enforcement activity and having one of the best enforcement programs in the ESC.  Swift admitted that the DC division has only one enforcement case that did not go forward, and that was through no fault of the safety investigator, who wrote the citation properly with the limited information he had at the time.  Id.

### 4.  Miller Selects Poyer over Plaintiff for ESC Director Position

Plaintiff initiated a complaint over his PY 2006 rating in late October 2006.
Plaintiff applied for the ESC Director position in December  11/15/06.  Pl Dec. at para
17; attach 19.   Plaintiff clearly had all the KSA's for the position, having held every
enforcement position over the prior 20 years and having supervised enforcement staff for
several years.  Id.   Poyer's application—Id. Attach 20—had little enforcement
experience and his experience was strategic planning from headquarters. Id.  Miller
intentionally disregarded agency orders—Pl Dec. para 18, attach 21-- to have a diverse
selection panel and to serve as head of the panel in order to stack the panel with his
Caucasian friends who gave Poyer inflated scores and Plaintiff poor scores.  Id.  Even
when Plaintiff answered questions with examples of his performing the agency's mission
at a high level, he was given low scores;   Poyer was given high scores for simply be able
to identify the agency's mission.  Id.

### 5.  Agency Threatens Plaintiff With Loss of Job;  Confiscates Grant Files

Plaintiff learned that his grant files were going to be reviewed in late 2007.
He cooperated with the review team headed by Sheila Brooks in every way.  Pl Dec. at
para 21.   However, Hartman accompanied the review team back to the DC office on
12/3/07 in a surprise visit.   This time they wanted complete copies of all the grant files.
Hartman told Plaintiff in the presence of McWay, that he should consider looking for a
position outside the agency and intimated that Plaintiff "should know that they are going
to find something."  Pl Dec. at para 22.    Plaintiff responded that he had nothing to hide
and they could look through the files all they wanted.  Id.

It was right after this meeting that Plaintiff found that Miller had transferred a large portion of his enforcement work to the Maryland division located in Baltimore.  Pl Dec. 25.

## 6.   Plaintiff Adamantly Denies Requesting Transfer of Enforcement Activity From Southern MD Counties

Plaintiff admits that after Miller allowed Safety Investigator Hanley to return to New England in August 2006, he asked to be relieved of new entry audits for MD. However, in late 2007, Miller took away nearly 90 percent of Plaintiff's enforcement work which he had been doing for years.  Pl Dec. at para 25.   Later Miller transferred one of Plaintiff's two safety investigators to Baltimore because Plaintiff did not have enough enforcement work left in his division.   Plaintiff predicted this would happen and objected.   Id.

About the same time that Miller was transferring most of Plaintiff enforcement work to Baltimore and reducing Plaintiff's staff to only one investigator from the three he had in August 2006, Miller proposed Plaintiff for a 7 day suspension on 12/19/07.  Pl Dec. at para 26;   attach 32.

## 7.   Miller Proposes Plaintiff for 7 Day Suspension For Pretextual Reasons

The reasons that Miller cites Plaintiff for were totally pretextual.  Id.  Plaintiff had changed all the ratings of his subordinates as directed and there was not a shred of evidence that he was directed not to ask any questions at a staff meeting of division administrators, as Miller claimed for the second specification.  Pl Dec. 28.   Plaintiff

refuted the allegations in detail.  Id at attach 33.   Even Hartman could not find support

for the second specification, but claimed that Plaintiff had not changed the evaluations of

his staff as directed in reducing the 7 day proposed suspension to 5 days.   Def. Attach M.

Pl Dec at para 29; attach 34 shows that Maryland division administrator Barbara Webb

Edwards was issued only a counseling for failing twice to change her staff's evaluations.

### 7.  Miller Proceeds to Issue Plaintiff Poor PY Reviews for 2007; Places Him on PIP; Issues Him Unsat Rating for PY2008 and Hartman Involuntarily Transfers Him

Plaintiff outlines in his declaration –Pl dec. at para 30-34—how Miller had been

seeking to remove him from his DC division administrator position since the time he

approached Marlene Thomas in November 2006 seeking to know what steps he would

have to take to do it properly.

In the identification of genuine factual issues, Plaintiff identified that Miller cited

to Swift and Poyer as providing evidence of Plaintiff's poor job performance.  However,

Swift denied that the DC division had anything more than "similar" issues to other

divisions and both Swift and Poyer admitted that they were charging errors to the DC

division relating to new interpretations being issued by ESC and were applying them

retroactively to DC.   See many cites to Swift's testimony in the identification of

disputed issues supra at para 3 and 4; Pl Dec. attach 15.   Poyer's testimony about

retroactive application of "errors" is noted at Pl Dec. para 31; attach 36.

On February 6, 2009, Hartman issued Plaintiff his unsatisfactory PY 2009 and

informed him that he was being involuntarily transferred to his present GS-14 Office of

Civil Rights "senior" investigator position.  Pl Dec. at para 22.   The rating referred to

Poyer's PIP report as being attached.   Plaintiff asked for a copy, but Hartman claimed

that he did not have one.   It took him almost a week to get Plaintiff a copy of the report

which was referred to as part of the FY2008 evaluation.   Id.

Plaintiff has rebutted the claims of poor work performance in detailed rebuttals

that he prepared to their affidavits given to the EEO investigator.   They are attached as

Attach 35 to his Declaration.

ARGUMENT

**A. Summary Judgment Standards:**

Summary judgment may not be granted unless the record is clear that the moving

party has demonstrated that there are no genuine issues of material fact in dispute and

that the moving party is entitled to judgment as a matter of law. Czekalski v. Peters, 475

F.3d 360, 363 (D.C. Cir. 2007); George v. Leavitt, 407 F.3d 405, 410 (D.C. Cir. 2005);

Fed R. Civ. P. 56(c).  In examining the record, the reviewing court must view all

inferences in a light most favorable to the non-moving party, Adickes v. S.H. Kress &

Co., 398 U.S. 144, 157 (1970), and "assume the truth of the non-movant's evidence." See

also, George v. Leavitt, 407 F.3d at 410.

The Supreme Court has specified the standards for reviewing employer's motions

for summary judgment in employment discrimination case.  It has held that, " the Court

should review all of the evidence in the record. Reeves v. Sanderson Plumbing, 530 U.S.

133, 140 (2000).  In doing so, however, the court must draw all reasonable inferences in

favor of the nonmoving party, and it may not make credibility determinations or weigh

the evidence. Reeves v. Sanderson Plumbing, 530 U.S. 133, 140 (2000).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Id. at 143 (internal quotation marks omitted ). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. (emphasis supplied).  The Court may not grant the motion unless there is "abundant and uncontroverted independent evidence that no discrimination occurred." Id.  at 148.

In determining whether a reasonable jury could find discrimination under the facts as developed on summary judgment, the only question should be whether the employee's evidence, taken in its totality, is enough evidence to prove discrimination, was a motivating factor for the defendant's actions.  Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).  Once the defendant articulates a non-discriminatory reason for its actions, there is no need to examine whether there is a *prima facie* case. The defendant has waived that challenge.  Id.

Under Title VII, the employee does not have to prove that discrimination or retaliation was the sole factor. McDonnell Douglas v. Green, 411 U.S. 792, 803-4(1973); (employee's prior illegal behavior grounds not to hire but summary judgment not appropriate because race discrimination was also an issue); McDonald v. Santa Fe Transportation Corp., 423 U.S. 273, 276 (1976)(fact that white employee was fired for admittedly stealing was not determinative of race discrimination or grounds for summary judgment because two black employees also stole but were not terminated).  See also 42 U.S.C. § 2000-2(m); (" an unlawful employment practice is established when the complaining party demonstrates that. . .sex  . . .was a motivating factor for any

employment practice") and <u>Porter v. Natsios</u>, 414 F.3d 13, 18-9 (D.C. Cir. 2005).  The

elements used to establish the so-called prima facie case are important for such a

determination, but they are not exclusive or determinative.  <u>Brady v. Office of Sergeant at</u>

<u>Arms</u>, 520 F.3d at 494.

     In a discrimination case, important elements of proof still include the employee's

membership in a protected class, whether he suffered an adverse action, whether the

employer treated him differently from employees outside his protected class to whom he

could reasonably be compared and whether there were statements by decision-makers

directed toward him that would prove discriminatory motive.  <u>Czekalski v. Peters</u>, 475

F.3d at 367-69.

     Similarly, on summary judgment, the Court may review the strengths or

weaknesses of the defendant's alleged legitimate, non-discriminatory reasons for its

conduct.  While finding all reasonable inferences of the evidence in favor of the

employee, the Court must balance the defendant's justifications for its conduct against the

employee's evidence that these justifications are false, that is pretexts for discrimination

or retaliation, or that the defendant was more likely than not motivated by discriminatory

or retaliatory animus. The employee may prove illegal animus "either directly by

persuading the [fact finder] that a discriminatory reason more likely motivated the

employer or indirectly by showing that the employer's proffered explanation is unworthy

of credence." <u>George v. Leavitt</u>, 407 F.3d at 414, quoting <u>Tex. Dep't of Cmty. Affairs v.</u>

<u>Burdine</u>, 450 U.S. 248, 256 (1981) and <u>United States Postal Serv. Bd. of Governors v.</u>

<u>Aikens</u>, 460 U.S. 711 at 716 (1983).  This standard may be met "'by showing that the

proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's

challenged conduct, or (3) was insufficient to warrant the challenged conduct." Tisdale v. Fed. Express Corp., 415 F.3d 516, 529 (6th Cir.2005) (internal quotation marks and citation omitted); See also, Tuttle v. Metropolitan Government of Nashville, 474 F.3d 307, 319 (6th Cir. 2007).

Similarly, the D.C. Circuit has this burden can be met with a host of available evidence:

> . . .the focus of proceedings at trial (and at summary judgment) will be whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

> Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289, 1294 (D.C. Cir. 1998)(en banc).

See also, George v. Leavitt, 407 F.3d at 414. ("[A]n employer's reason need not be false in order to be pretextual.") .

## I.   Defendant Has No Argument on Administrative Exhaustion

## A.  45 Day Limit Commences When Plaintiff Learned Enough to Reasonably Suspect Discrimination

As this court recently held in **Miller v. Hersman**, 594 F.3d 8 (DCCA, 2/5/10), (reversing summary judgment on this issue) the Defendant agency bears the burden of demonstrating that there was no disputed issue of when Plaintiff "knew or reasonably should have known of the alleged discrimination."  As the court recognized, the plaintiff

"has a responsibility, when possible, to further investigate a personnel action in order to determine whether the action was discriminatory."

Here Defendant claims that the 45 days began running when Plaintiff was handed the rating by Miller on 8/18/06.  Def. Br. at p. 26.  However, Defendant has numerous problems with argument.  First, Plaintiff is adamant that he first saw a draft of the rating on August 21, 2006.  Pl Dec. para 5.  Plaintiff is "quite certain" that there were no numbers rating the various elements on the draft given him" so he did not really know how low he was being scored.  Id. at footnote #7.   Plaintiff repeatedly requested Miller to provide him a copy of the rating and also to meet with him to discuss the specifics of the rating. Pl Dec. at para 6; attach 5.   Miller kept putting him off until finally he was sent the actual performance review on November 15, 2006 and was granted a meeting with Miller on 11/17/06.  Arguably, it was only at this time that Plaintiff had reasonable notice of the poor scoring he received on the rating and the pretextual nature of the explanation for the poor scoring given him.

Defendant acknowledges that Plaintiff initiated contact with a counselor on October 30, 2006.  As part of his investigation, Plaintiff actually met with the Director of the agency's office of Civil Rights in mid October and complained about still not having received a copy of the evaluation and some other recent incidents involving Miller trying to get some of his subordinates in trouble.  Pl Dec. para 7.   Clearly, Plaintiff was still exploring whether he had enough to bring a complaint at this point.   Defendant's delay in providing Plaintiff with a copy of the 2006 evaluation until November 15, 2006 was sufficient reason for him to hold off initiating a complaint until he saw the scoring that he got on the elements.   See **Wilson v. Pena**, 79 F.3d 154 (CADC 1996)(agency's delay in

providing explanation for backpay calculation equitably tolled period for initiating contact).

Defendant cites to **Steele v. Schafer**, 535. F. 3d 689, 693 (DCCA 2008). However, that decision reversed the lower court's grant of summary judgment on this issue.

### B.  Defendant Has No Basis For Claiming Timeliness on Plaintiff's 2007 Retaliation Claims

Defendant argues that Plaintiff did not timely initiate contact on his second group of claims in 2007 because he did not initiate contact with a counselor within 45 days of each adverse action complained of.   Def. Br. 26-27.

However, the agency's argument here borders on being advanced in bad faith. Plaintiff has provided each email that he sent to the Civil Rights Office seeking to add each new allegation well within 45 days of the adverse action complained of.   Pl Dec. footnote 9; attachment 17.   The emails are actually attached to undersigned's letter to the EEO Chief Judge, with copy to agency counsel, that complain about the agency not processing his complaints of discrimination.

This was the same situation which led the court to reverse summary judgment in **Miller v. Hersman**, **supra,**  on count II.  There as here the court found it sufficient for Plaintiff to raise a genuine issue that he brought the matter to the Agency's civil rights office attention and sought to initiate a complaint.    For the agency to advance this argument when they were responsible for delaying the processing of the complaint really presents the limits of audacity.   Further evidence that the agency knew that it was responsible for the delayed processing of Plaintiff's requests to initiate complaints is

reflected by the fact that the agency did not challenge timeliness on any of these issues and accepted each for investigation.

## II.   Defendant's Arguments III, IV and V Appear To Be Moot

Although initially accepting the issues as properly raised in their acceptance letter, the Defendant now claims that Plaintiff's separately listing issues in his EEO complaint regarding special oversight of its office's enforcement actions by ESC, transfer of its enforcement duties to the Baltimore office and the grants audit that was conducted in November 2007 are not separately actionable.    Plaintiff properly listed these issues as part of his hostile environment claim and they are properly includable in that claim. Note that in the federal court complaint, Plaintiff treats these three items as evidence of disparate treatment and hostility and does not separately allege that they are actionable. We believe therefore that Defendant's raising them in their summary judgment brief is basically an attempt at distraction because they are not plead as separate actionable items. Plaintiff treated them the same way in the administrative forum.

## III.  Plaintiff Clearly Raises Genuine Issue about Poyer's Selection as Eastern Service Center Director

Def. Attach D is Miller's 1/16/07 justification memo for selecting Poyer for the ESC Director position.   Plaintiff has clearly demonstrated the following evidence that shows a pattern of discrimination relating to Miller's selection of Poyer for the ESC Director position: (1) Miller had already reduced Plaintiff's PY 2006 rating discriminatorily and had questioned SES head of HR and Finance Marlene Thomas in November 2006 about what steps were needed to get Plaintiff out of his division

administrator position. Pl Dec at para 13.  This revealed hostility toward Plaintiff even

before the selection decision was made in early 2007. (2) Plaintiff demonstrated that

Miller totally disregarded agency policies requiring a diverse make up for selection and

interview panels and for the selecting official to serve on the interview panel.  Id, at para

18; attach 21;  (3)  Plaintiff showed  that he had far more experience performing the

enforcement and financial grant management functions that were required for the position

and had far stronger KSA's for the position than Poyer. Id. (4)  Finally, Plaintiff showed

that the three Caucasians selected for the interview panel artificially gave inflated scores

to Poyer and pretextually reduced Plaintiff's scoring in response to question 1, as an

example.  Id at para 18.

Evidence of Miller's failure to follow agency procedures alone for this selection

would raise sufficient issue where the qualifications were close.   Here the qualifications

were not close and there was prior evidence of malice against Plaintiff by Miller.  **Aka v.**

**Washinton Hospital Center**, 156 F.3d 1284 , 1294(DCCA, 1998).   Clearly Plaintiff has

presented sufficient evidence for a reasonable jury to determine that Miller did not follow

agency required procedures because he wanted to assure that Poyer would be selected

(and Plaintiff  would not be selected) for the position by carefully selecting Caucasians

who would serve on the panel and do his bidding.

## IV.  Miller's 7-Day Proposed Suspension Pretextual

Miller proposed Plaintiff for a 7 day suspension on 12/19/07.   Hartman reduced it

to a 5 day suspension on 1/28/08.   Pl Dec at para 26 and 27.   Plaintiff adamantly denies

that he engaged in either act alleged in the two specifications and provided evidence that

he actually changed the evaluations of his subordinates as directed by Miller.   Id.   Even
Hartman agreed that there was no support for the second charge against Plaintiff and so
stated in reducing the proposed suspension to 5 days.

This suspension was proposed by Miller within days after the Hartman threatened
Plaintiff on 12/03/07 that he should consider leaving the agency and voluntarily give up
his division administrator position because they were going to "find something" in the
files they just confiscated from the divisions office.   The evidence that management was
seeking to intimidate Plaintiff out of his division administrator position because Miller
held animosity toward Plaintiff, considered together with the fact that Plaintiff did not
engage in the misconduct alleged, could certainly lead a reasonable jury to determine that
management was attempting to put together a paper trail to support removing Plaintiff
from his position.

### V.   Plaintiff Presented More Than Enough Evidence of Discriminatory and Retaliatory Treatment For a Reasonable Jury to Find That His PY 2007 and 2008 ratings, the PIP, and the Involuntary Reassignment to Civil Rights Were All Illegally Motivated

Defendant last argues that there are no material disputed facts relating to Miller's
treatment of Plaintiff leading up to his poor performance evaluations in PY 2007 and
2008 and his involuntary reassignment to the Office of Civil Rights.   Def Br. pp. 37-39.

Plaintiff submits that he has identified in some great detail in his Declaration with
attachments and in his detailed response to Defendant's 134 assertions of undisputed fact
that Miller, Poyer, Swift and Hartman were seeking to get him out of his division
administrator position as early as November 2006, when he was still rated even by Miller
as "fully achieved" results.   We have shown that Miller was looking to create a paper
trail to document the reasons for removing Plaintiff from his position.   Miller first

claimed that the federal program review results led to his insisting that all of the district's work had to be first reviewed by the ESC before it could be cleared.   However, even Swift admitted that any mistakes that the DC division was making were "similar" to what other divisions were doing.   Both Swift and Poyer admitted that only the DC division was getting gigged for alleged "errors" that all the divisions were making.   And finally, both Swift and Poyer admitted that many of the "errors" being charged against the DC division were because the ESC were changing rules and retroactively applying them only against Plaintiff's DC division.

Clearly a reasonable jury could find that the above evidence demonstrated that Miller and Hartman were seeking to remove Plaintiff from his division administrator position for discriminatory and retaliatory reasons and that his involuntary reassignment to the Office of Civil Rights was pretextual.

## CONCLUSION

Plaintiff has demonstrated that Miller was seeking to remove him from his position within months over taking over the Field Administrator position in June 2006. From the remarks that Plaintiff was hearing from Ellise Griffin and Curtis Thomas, who reported Miller's meeting with Marlene Thomas in November, 2006, seeking ways to remove him from his position,  Miller's motive was clearly discriminatory and racially motivated.   However, after Plaintiff commenced his first complaint of discrimination against Miller in October 2006, Miller became much more highly animated and retaliation became a motivating animus in his attempting to remove Plaintiff from his position by creating grant file issues that did not exist;  by claiming misconduct that did

not exist; and by retroactively applying new interpretations only against the DC division and claiming "errors" based on these strained interpretations applied retroactively.

It is hard to imagine a less appropriate case for summary judgment than this case. Clearly Plaintiff has demonstrated a pattern of discriminatory and retaliatory conduct against him that resulted in his being non-selected for the ESC Director position and the denial of good evaluations and awards and the issuance of poor and unsatisfactory evaluations, disciplinary suspension, being place on a PIP and then being removed from the division administrator position that he so much loved for pretextual reasons. Certainly a reasonable jury could find from the overwhelming evidence that Plaintiff has presented.

Respectfully submitted,

FOR THE PLAINTIFF,

_____/s/_____

James L. Kestell