**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**TAFT KELLY,**

    **Plaintiff,**

       **v.**

**RAY LAHOOD, Secretary, United States**
**Department of Transportation,**

    **Defendant.**

</td><td>

**Civil Action No.  09-00703 (JEB)**

</td></tr>
</table>

<u>**MEMORANDUM OPINION AND ORDER**</u>

      Plaintiff Taft Kelly is a black man who has worked for the Department of Transportation

for more than twenty years.  He maintains in this suit that, in a series of incidents beginning with

a poor performance appraisal in 2006 and culminating in his involuntary transfer in 2009, DOT

discriminated against him on the basis of race and retaliated against him for attempting to

vindicate his rights.  DOT has now filed a Motion for Summary Judgment.  Because the Court

finds that Kelly has failed to exhaust his administrative remedies with regard to certain claims

and that no reasonable jury could find DOT's stated reasons for other actions were pretextual, it

will grant the Motion in those parts.  As Plaintiff, however, has produced evidence sufficient for

a jury to find discrimination or retaliation with respect to his 2008 rating and subsequent

involuntary transfer, the Court will deny the Motion as to that claim alone.

**I.**      **Background**

      At the time of his 2009 transfer, Kelly had been employed as the Division Administrator

of the D.C. Division of the Federal Motor Carrier Safety Administration (FMCSA), a distinct

administration within DOT, since 2001.  <u>See</u> Def.'s Statement of Undisp. Mat. Facts (SUMF) at

1 (citing Mot., Exh. 6 (Pl.'s Dep.) at 29).  In that role, Kelly was responsible for managing

DOT's enforcement functions within the District, administering federal grants, and supervising

the staff assigned to the division.  See Def.'s SUMF at 1-7.  In 2006, Kelly's former first-line

supervisor retired and was replaced by Robert Miller.  See Mot., Exh. 7 (Dep. of Rose

McMurray) at 9; id., Exh. 8 (Dep. of Robert Miller) at 11.  The incidents at issue in this case

began shortly thereafter.

June 30, 2006, marked the end of the appraisal period for performance year (PY) 2006.

Pl.'s Decl., ¶ 5; Mot, Exh. D (PY 2006 Performance Appraisal).  Because Miller had had little

opportunity to work with Kelly — or any other division administrator — during PY 2006, Miller

relied on feedback from other employees in evaluating Kelly's performance.  See Mot., Exh. 10

(Dep. of Danny Swift) at 85-92; see generally PY 2006 Performance Appraisal.  Specifically,

Miller met with Danny Swift, who had briefly overseen Kelly's work prior to Miller's

appointment, to obtain information regarding Kelly's performance.  See Swift Dep. at 7-8, 85-86.

Based on criticisms elicited from Swift and on his own analysis of data regarding the

productivity of the D.C. Division, Miller gave Kelly only an "Achieved Results" rating for PY

2006.  See Miller Dep. at 15-16; PY 2006 Performance Appraisal at 7-9; Swift Dep. at 85-92.

Between October 23 and November 13, 2006, DOT announced that it was seeking to fill

the position of Service Center Director for the Eastern Services Center (ESC).  See Miller Aff., ¶

3; id., Attachment A (Announcement No. FMCSA.RC-2007-0002). Seven candidates, including

Kelly, applied for the position.  Id., ¶ 3; id., Attachment B (Applicant Score Sheet).  Miller, who

served as the selecting official, reviewed the candidates' application packages and assigned each

a numerical rating for writing skills, past work experience, direct program knowledge, and

relevance and importance of past achievements.  See id., ¶¶ 3-5; Applicant Score Sheet.  He gave

the highest score to Scott Poyer, a mixed-race male, and ranked Kelly's application third.  See Applicant Score Sheet; Mot., Exh. 9 (Dep. of Scot Poyer) at 11.

Following this initial numerical scoring, Miller convened a three-person panel to interview all seven applicants and make a recommendation.  Miller Aff., ¶ 4.  The panel was comprised of three white individuals who interviewed the candidates using a set of standardized questions and guidelines provided by Miller.  See id., ¶ 6; id., Attachment C (ESC Service Center Director Interview Questions); Pl.'s Decl., ¶ 18.   Following the interviews, the panel unanimously recommended Poyer to fill the position.  See id., ¶ 8; id., Attachment C (Email from Darrell Ruban, Jan. 16, 2007); Applicant Score Sheet; Poyer Dep. at 11-12.  Combining Miller's initial scores with the panels', Kelly remained the third best candidate, scoring a total of 65 points compared to Poyer's 85 points.  See Miller Aff., ¶ 8; Applicant Score Sheet.  Miller subsequently appointed Poyer to the position.  See Miller Aff., ¶ 8; id., Attachment D (Memorandum from Rovert Miller, Jan. 19, 2007).

During his mid-year review for PY 2007, Miller informed Kelly that his performance had been only "Minimally Satisfactory" so far that year and provided him with a document detailing specific areas in which he would be expected to improve.  See Mot., Exh. G (PY 2007 Performance Appraisal) at 6-14.  At the close of the PY 2007 evaluation period, Miller determined that Kelly had failed to demonstrate improvement, and he accordingly received a rating of "Minimally Satisfactory" on his final PY 2007 performance appraisal.  See id. at 1.  Again, Miller provided Kelly with a detailed explanation of the areas in which his performance had been lacking.  Id. at 16-17.  In particular, Miller emphasized that Kelly "did not provide sufficient leadership and supervision to . . . staff," had been "non-supportive and/or non-

responsive to program issues raised by . . . staff," and did not "accept program guidance and direction without challenge." Id. at 16.

On September 21, 2007, Poyer sent an email to all DAs requesting that they submit proposed annual performance ratings and award recommendations for their staff members. See Mot., Exh. J (Email from Scott Poyer, Sept. 21, 2007). The email emphasized that the proposed ratings were "not to be shared with . . . staff until . . . they become final." Id. (emphasis in original). After Kelly submitted his proposed ratings, which Miller subsequently adjusted downward, he violated this directive by delivering his initial ratings to each of his employees. See Miller Aff., ¶¶ 16, 18; Mot., Exh. L (Performance Appraisals for Dave Price, Bernard McWay, and Ellise Griffin). After discovering this, Miller instructed Kelly to issue the ratings he had approved. Miller Aff., ¶ 18; Pl.'s Decl., ¶ 27. Instead of correcting the ratings, however, Kelly circled, dated, and initialed his original ratings. See Performance Appraisals for Price, McWay, and Griffin; Pl.'s Decl., ¶ 27. Kelly admits to having disregarded Miller's instructions and issuing his initial ratings instead of the amended ones, testifying that he did so because he did not believe the amended ratings were "correct, fair, and equitable." Pl.'s Dep. at 95; see also Pl.'s Decl., ¶ 27.

Following this incident, on December 6, 2007, Miller proposed that Kelly be suspended for failing to follow instructions and improper conduct. Miller Aff., ¶ 18. Miller's supervisor, Daniel Hartman, sustained the charges of failure to follow instructions and imposed a five-day suspension; he declined to sustain the charge of improper conduct. See Mot., Exh. M (Memorandum from Daniel Hartman, Jan. 17, 2008); Miller Aff., ¶ 19. Hartman issued Kelly a five-page letter explaining his decision on January 17, 2008. See Hartman Memorandum, Jan.

4

17, 2008.  Kelly was suspended for five calendar days beginning January 28, 2008.  See id.; Pl.'s Decl., ¶ 27.

On September 3, 2008, Miller informed Kelly that, because his performance continued to be unacceptable, he would be placed on a Performance Improvement Plan (PIP) in lieu of receiving an "Unsatisfactory" rating for PY 2008.  See Mot., Exh. C (Memorandum from Robert Miller, Sept. 3, 2008).  Consistent with the PIP, Kelly's PY 2008 rating period would be extended through December 12, 2008.  See id.  Kelly was notified that if his performance did not improve by then he could be reassigned, reduced in grade, or terminated.  See id.  Miller described in great detail the areas in which Kelly's performance remained unsatisfactory and provided specific standards that Kelly would be expected to meet.  See id.  Miller informed Kelly that Poyer would administer the PIP and would meet regularly with him to evaluate his progress. See id.; Poyer Dep. at 22.

Having met regularly with Kelly during the PIP period, Poyer issued a detailed report on Kelly's performance after the conclusion of Kelly's extended 2008 appraisal period.  See Mot., Exh. N (Report of the PIP of Taft Kelly) at 1-2.  Poyer suggested that Kelly had not met the performance goals set out in the PIP and had not improved his performance to a satisfactory level.  See id.  After reviewing this report and discussing it with Poyer, Miller issued Kelly an "Unsatisfactory" rating for PY 2008 and determined that he was unable "to effectively and satisfactorily perform the duties of a Division Administrator."  Mot., Exh. O (PY 2008 Performance Appraisal) at 1, 8-11.

Following this appraisal, Miller, along with several of his supervisors, ultimately determined that reassigning Kelly to another office within the DOT would best solve the performance issues that had emerged over the previous years.  See McMurray Dep. at 35;

Hartman Dep. at 62-63.  On February 6, 2009, Hartman issued Kelly a letter explaining that he

had been reassigned to Office of Civil Rights (OCR).  <u>See</u> Mot., Exh. P (Directed Reassignment,

Feb. 6, 2009).

Kelly first initiated contact with an EEO counselor on October 30, 2006, claiming that

Miller was subjecting him to a hostile work environment and that his PY 2006 rating was

discriminatory.  <u>See</u> Pl.'s Dep. at 42; Mot., Exh. Q (Formal Complaint of Discrimination, Jan. 1,

2007).  He filed a formal complaint on January 7, 2007, requesting a hearing before an EEOC

administrative law judge.  <u>See</u> Formal Complaint of Discrimination, Jan. 1, 2007.  He voluntarily

withdrew this request, however, and the EEOC action was dismissed on January 13, 2009.  <u>See</u>

Mot., Exh. R (Order of Dismissal).  Kelly again initiated contact with an EEO counselor on

February 2009, claiming he had been subjected to discrimination and retaliation when he

received the PY 2008 "Unsatisfactory" rating and when he was involuntarily reassigned to the

OCR.  <u>See</u> Mot., Exh. S (Report of Investigation, No. DOT-2009-22632-FMCSA-02); Pl.'s Dep.

at 132, 135.  In addition, he claimed he had been subjected to a hostile work environment.  <u>See</u>

Report of Investigation.

On April 16, 2009, Kelly initiated the instant action.  His First Amended Complaint

charges DOT with having discriminated against him on the basis of race when it issued his PY

2006 Performance Appraisal and with having both discriminated and retaliated against him when

it issued his appraisals for PYs 2007 and 2008, suspended him, declined to promote him, and

transferred him involuntarily to another position. <u>See</u> First Am. Compl., ¶¶ 27-28.  Defendant —

technically, Secretary of DOT Ray LaHood, but referred to throughout simply as "DOT" — has

now moved for summary judgment.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S. at 248. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, Inc., 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." Taxpayers Watchdog, Inc., v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987). When a motion for summary judgment is under consideration, "the evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [her] favor." Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is

required to provide evidence that would permit a reasonable jury to find in its favor.  Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  Liberty Lobby, Inc., 477 U.S. at 249-50.

## III.   Analysis

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), or "because he has made a charge . . . or participated in any manner in an investigation" of employment discrimination.  42 U.S.C. § 2000e-3(a).  Kelly alleges that DOT unlawfully discriminated against him on the basis of race and/or retaliated against him when it issued him poor performance evaluations for PYs 2006, 2007, and 2008, suspended him, declined to promote him, and involuntarily reassigned him to another position.[1]  DOT maintains, however, that Kelly has failed to exhaust certain of his claims and has not presented evidence sufficient for a reasonable jury to find in his favor on those remaining.  The Court will first consider whether Kelly has exhausted his administrative remedies; it will then turn to the merits of those claims that have been properly exhausted. Finally, because Kelly's Opposition to the instant Motion makes a brief reference to his having raised a hostile-work-environment claim, the Court will determine whether he has actually done so.

---

[1] By using the words "*inter alia*," Kelly's Complaint suggests that these were not the only incidents he believed to have been unlawful. Except for a brief reference to an intended hostile-work-environment claim, however which is addressed *infra*, Section III.C, neither his First Amended Complaint nor his Opposition to the instant Motion identifies other independently actionable grounds for this suit.

A.  Exhaustion

"Before filing suit, a federal employee who believes that her agency has discriminated against her in violation of Title VII must first seek administrative adjudication of her claim." Payne v. Salazar, 619 F.3d 56, 58 (D.C. Cir. 2010) (citing Scott v. Johanns, 409 F.3d 466, 468 (D.C. Cir. 2010) and 42 U.S.C. § 2000e-16(c)).  EEOC regulations require that "[a]ggrieved persons who believe they have been discriminated against on the basis of race," 29 C.F.R. § 1614.105(a),  "must initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  Id. § 1614.105(a)(1).  Unless the employee provides an acceptable ground for the equitable tolling of the 45 days, failure to initiate contact with an EEO counselor within that time period serves as a bar to his claims.  See Stewart v. Ashcroft, 352 F.3d 422, 425-26 (D.C. Cir. 2003); 29 C.F.R. § 1614.105(a)(2).

DOT contends that Kelly failed to exhaust his administrative remedies with respect to all claims stemming from his PY 2006 Performance Appraisal and his 2008 suspension.  DOT also contends that he failed to exhaust claims relating to other incidents that occurred in 2007, but as Kelly has conceded those incidents are not independently actionable, see Opp. at 23, the Court need not address them here.

*1.  PY 2006 Performance Appraisal*

According to the date accompanying his signature on the document, Kelly received his PY 2006 rating on August 18, 2006.  See PY 2006 Rating (Kelly's signature is dated 8/18/2006). Despite his dated signature, however, Kelly "is adamant that he first saw a draft of the rating on August 21, 2006."  Opp. at 21 (citing Pl.'s Decl., ¶ 5).  This dispute is immaterial: even assuming

Kelly were correct that he received the rating on the 21st, he concedes that he did not initiate

contact with a counselor until October 30, 2006, 69 days later.  See id.

Kelly nevertheless contends that he satisfied his exhaustion obligation because the 45-day

clock did not begin ticking until November 15, 2006, when he alleges he first received a copy of

the appraisal that memorialized the rating.  See id.  The regulations provide that the 45-day limit

shall be extended "when the individual shows that he or she was not notified of the time limits

and was not otherwise aware of them, that he or she did not know and reasonably should not

have known that the discriminatory matter or personnel action occurred."  29 C.F.R. § 1614.105.

Kelly testified that he "was of the impression throughout that [the] time period for initiating

some action would not run until [he] was actually presented with a copy of the evaluation."  Pl.'s

Decl., ¶ 7.  He further claims that although he saw the final "Achieved Results" rating in August,

he did not see the scores for the various performance sub-categories until he received a copy of

the appraisal in November.  See  Pl.'s Decl., ¶ 5 & n.7.  For these reasons, he argues November

15 marked the beginning of the 45-day period.

Kelly provides no basis for his "impression" that the 45 days did not begin to run until he

received a personal copy of the appraisal.  His own testimony establishes that he was aware that

there was a 45-day limitation; he also admits that he was aware of the "Achieved Results" rating

in August.  See Pl.'s Decl., ¶¶ 5-7.  More significantly, the fact that he initiated contact with a

counselor on October 30, 16 days prior to the day he would have the clock begin, moreover,

belies any contention that he "did not know and reasonably should not have known" that the

discriminatory action took place until November 15.  See Mot., Exh. Q (Complaint of

Discrimination); Opp. at 21.  The Court, accordingly, concludes that Kelly failed to exhaust his

administrative remedies with regard to any claim arising from the PY 2006 Performance
Appraisal.

### 2.   *2008 Suspension*

Kelly was suspended in January 2008.  He has provided no evidence, however, that he
raised this incident with the EEO Office until February 2009, more than a year after the
suspension took place.  The emails he maintains satisfied his exhaustion obligation simply make
no mention of the suspension incident.  See Pl.'s Decl. at n.9; Opp., Exh. 17 (Emails from Taft
Kelly); Opp. at 22-23.  In the absence of any evidence that the suspension claim was properly
exhausted or any suggestion that the 45-day period should be tolled, the Court can only conclude
Kelly failed to exhaust this claim.

### B.   Remaining Discrete Discrimination and Retaliation Claims

The four properly exhausted claims remain: the PY 2007 performance evaluation, the
nonselection for the ESC Director position, the PY 2008 performance evaluation, and the
involuntary transfer.  Because Kelly's PY 2008 evaluation is both temporally and causally
connected to his involuntary transfer, the Court will examine those two incidents together.

To survive summary judgment on each of these claims, Kelly must provide sufficient
evidence for a reasonable jury to determine that 1) he suffered an adverse employment action 2)
because of his race or his protected activity.  See Brady v. Office of Sergeant at Arms, 520 F.3d
490, 493 (D.C. Cir. 2008); Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009).  With regard
to the second element, if "an employer has asserted a legitimate, non-discriminatory reason" for
its employment decision, the Court must simply "resolve one central question: Has the employee
produced sufficient evidence for a reasonable jury to find that the employer's asserted non-
discriminatory reason was not the actual reason and that the employer intentionally discriminated

against the employee on the basis of race" or on the basis of his protected activity?  <u>Brady</u>, 520

F.3d at 494; <u>Jones</u>, 557 F.3d at 678 (<u>Brady</u> "principles apply equally to retaliation claims").

       1.   *PY 2007 Performance Evaluation*

      Kelly claims that his "Minimally Satisfactory" evaluation for PY 2007 constituted an

unlawfully discriminatory and retaliatory employment action.  "[P]erformance evaluations,"

however, "ordinarily are not actionable under Title VII."  <u>Douglas v. Donovan</u>, 559 F.3d 549,

552 (D.C. Cir. 2009). In order for a performance evaluation to constitute an adverse action

cognizable under Title VII, "it must affect the employee's 'position, grade level, salary, or

promotion opportunities.'"  <u>Taylor v. Solis</u>, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting

<u>Baloch v. Kempthorne</u>, 550 F.3d 1191, 1199 (D.C. Cir. 2008)); <u>see also</u> <u>Taylor v. Small</u>, 350

F.3d 1286, 1293 (D.C. Cir. 2003) ("[F]ormal criticism or poor performance evaluations . . .

should not be considered [adverse actions] if they did not affect the employee's grade or

salary.").  Having provided no evidence suggesting that any tangible, objective harm

accompanied the PY 2007 evaluation, Kelly has not "discharge[d his] burden to show the

evaluations were 'attached to financial harms.'"  <u>Taylor</u>, 571 F.3d at 1321 (quoting <u>Baloch</u>, 550

F.3d at 1199).

      Even if the evaluation were an adverse action, moreover, Kelly has not provided evidence

sufficient for a reasonable jury to find that the rating was discriminatory or retaliatory.  DOT has

provided extensive documentation of the performance issues it maintains justified the poor

rating.  During Kelly's mid-year review, Miller provided him with a document detailing thirteen

areas of concern and nine "performance expectations" intended "to assist [him] in raising his

level of performance."  Miller Aff., ¶ 11.  His evaluation of Kelly's performance, moreover, is

corroborated by the testimony of other supervisors and by the findings of a federal program review.  See generally, e.g., Swift Dep.; Mot, Exh. B (FPR Report).

Kelly's Opposition to DOT's Motion for Summary Judgment, however, contains not a single citation to record evidence supporting his argument that Miller's explanation was pretextual.  See Opp. at 25-26.  Kelly challenges Miller's reliance on the results of the federal program review, contending that the report had exposed similar issues with other divisions.  See Opp. at 26; Pl.'s Decl., ¶ 19.  That may well be true.  It is indisputable, however, that the review revealed significant problems within Kelly's division, and, more importantly, the review was just one factor Miller considered.  In light of the extensive documentation of instances in which Miller's performance was lacking, no reasonable jury could conclude on the basis of the evidence Kelly has presented that his PY 2007 performance rating was pretext for discrimination or retaliation. The Court, therefore, will grant summary judgment for DOT on this claim.

### 2.  *Nonselection for ESC Director Position*

It is undisputed that the failure to promote an employee constitutes an adverse employment action.  See, e.g., Stella v. Mineta, 284 F.3d 135, 146 (D.C. Cir. 2002) ("no question that failure to promote is an 'adverse action'").  DOT, however, has offered a legitimate, nondiscriminatory reason for declining to offer Kelly promotion: Poyer, the individual ultimately chosen for the position, was the most qualified candidate.  Taking into account writing skills, work experience, program knowledge, and relevance and significance of experience, Miller scored Poyer's written submission 14 points higher than Kelly's.  See Miller Aff., Attachment B (Applicant Ratings).  The three panelists who conducted interviews, furthermore, unanimously ranked Poyer as the highest-scoring candidate.  See id.  Notably, Poyer had previous experience with DOT's Office of Strategic Planning, had demonstrated success in managing budgets, had

multiple graduate degrees, had leadership experience in both the public and private sectors, and had helped to develop a national quality assurance program. See Miller Aff., ¶ 9.

In light of this explanation, the only remaining question is whether Plaintiff has "produced sufficient evidence for a reasonable jury to find [this] reason was not the actual reason and that the employer intentionally discriminated against the plaintiff." Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (citing Brady, 520 F.3d at 493-95). In response, Kelly contends that Miller's having given him a poor rating for PY 2006, coupled with a conversation he had had with HR official Marlene Thomas in November 2006, "revealed hostility toward Plaintiff even before the selection decision was made in early 2007." See Opp. at 23-24. In addition, he argues that the composition of the interview panel violated agency policies in two ways: it was not sufficiently diverse and the selecting official, Miller, did not serve on it. See Opp. at 24. In support of this argument, he cites a memorandum that states that "[p]anel members must be selected with consideration to diversity and will include appropriate representation. The Selecting Official is the panel leader." See Pl.'s Decl., ¶ 18; Opp., Exh. 21 (Memorandum from Annette Sandberg, Dec. 18, 2003).

DOT maintains that the memorandum does not require a racially diverse panel; it merely states that the panelists "must be selected with consideration to diversity." Reply at 5; Sandberg Memorandum, Dec. 18, 2003. It concedes, however, that Miller violated internal policy by failing to serve on the interview panel. See Reply at 5. "Procedural irregularities," do not establish pretext "absent some actual evidence that defendant acted on a motivation to discriminate." Oliver-Simon v. Nicholson, 384 F. Supp. 2d 298, 312 (D.D.C. 2005). If, as Kelly alleges, Miller was primarily responsible for his allegedly discriminatory treatment, the fact that he did not serve on the panel can only have served to make the hiring decision less biased. The

deviation from policy, moreover, was not "so irregular or inconsistent with [DOT's] established policies as to make its hiring explanation unworthy of belief." Porter v. Shah, 606 F.3d 809, 816 (D.C. Cir. 2010).

In addition, Kelly argues that his nonselection was discriminatory because he was more qualified for the position than Poyer. Even if Kelly could demonstrate that he was better qualified than Poyer, however, such evidence does not suffice to support an inference of discrimination or retaliation; rather, a jury must be able to find he was "significantly better qualified for the job." Holcomb v. Powell, 433 F.3d 889, 897 (D.C.Cir. 2006) (emphasis added). The difference must be "great enough to be inherently indicative of discrimination." Jackson v. Gonzales, 496 F.3d 703, 707 (D.C.Cir. 2007) (internal quotation marks omitted). "In a close case, a reasonable [fact-finder] would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." Aka, 156 F.3d at 1294.

Kelly contends that his experience as a DA was more relevant than Poyer's experience in strategic planning and budgeting at DOT's headquarters. See Pl.'s Decl., ¶ 17. He also suggests Poyer had "little supervisory experience, and none over the employees in the field who have to carry out day to day enforcement activities." Id. Miller, however, scored Kelly higher than Poyer in terms of "direct program knowledge," which is consistent with Kelly's contention that he had more experience working directly with employees in the field. See Applicant Evaluation. He gave both candidates the same score with respect to past work experience. See id. Although Poyer's experience may have been different from Kelly's, Miller testified that he particularly valued Poyer's experience with the budgeting process, and, because he hoped the ESC Director "could establish a local [quality assurance] program for the ESC," Poyer's experience helping to

develop a national quality assurance program was also weighted heavily. <u>See</u> Miller Aff., ¶ 9. Add this to his indisputably superior educational credentials and it is clear Kelly cannot establish he was better qualified — let alone significantly better qualified — for the job.

Ultimately, absent a viable showing of pretext, the Court will defer to an employer's judgment concerning which of several employees was the best fit for a given position. Otherwise, the Court would impose itself as "a super-personnel department that reexamines an entity's business decisions – a role which [the D.C. Circuit has] repeatedly disclaimed." <u>Jackson</u>, 496 F.3d at 707 (internal quotation marks omitted). As Kelly has made no such showing, the Court will grant DOT's Motion for Summary Judgment with respect to the failure-to-promote claim.

> 3. *PY 2008 Performance Evaluation and Involuntary Transfer*

The determination that Kelly had failed his PIP, earning him a rating of "Unsatisfactory" for PY 2008, and his subsequent reassignment to the OCR were the culminating events in this case. DOT does not appear to contest that Kelly's reassignment constituted an actionable adverse employment action. Indeed, it is well established that a transfer to a position with "significantly different responsibilities" can constitute an adverse action. <u>See</u> <u>Forkkio v. Powell</u>, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 724, 761 (1998)).

DOT maintains that Kelly was reassigned as a result of the performance issues that had emerged over the prior two years. <u>See</u> Mot. at 39; Hartman Dep. at 62-63; McMurray Dep. at 35; Directed Reassignment, Feb. 6, 2009. In particular, during PY 2008, Miller determined that Kelly's performance merited an "Unsatisfactory" rating and that he was unable "to effectively and satisfactorily perform the duties of a Division Administrator." <u>See</u> PY 2008 Performance

Appraisal.  For example, Miller pointed to data suggesting that 58% of the work product produced by the D.C. Division required corrections and had to be returned.  See id.  In his reassignment memo, Hartman explained that because Kelly had not demonstrated an ability to perform the tasks of a DA and because his skills and experiences suited him for the Equal Opportunity Specialist position in the OCR, he would be reassigned to that role.  See Mot., Exh. P (Directed Reassignment, Feb. 6, 2009).

Kelly maintains that this explanation for his reassignment was a pretext for unlawful discrimination and retaliation.  Miller, he claims, had been "seeking to remove him from his position within months of taking over the Field Administrator position in June 2006" and had created a paper trail of poor evaluations that would ultimately justify his removal.  See Opp. at 26-27.  A few of Kelly's primary arguments in support of his version of the events are worth noting. He highlights the dearth of black employees working in high-level positions at DOT and points to incidents suggesting that other black employees were treated discriminatorily.  See Pl.'s Decl., ¶¶ 10, 16 & n. 2.  He identifies testimony suggesting that, following the federal program review, the D.C. Division received harsher criticism than other divisions that displayed similar shortcomings.  Id., ¶ 19.  One of his employees, Steven Henley, testified that he was "troubled for days" when Miller asked him a series of questions about Kelly and the other employees in the D.C. Division in what seemed like a "fishing expedition" for negative information.  Opp, Exh. 12 (Aff. of Steven Henley).  Another employee, Curtis Thomas, stated that Marlene Thomas, an HR employee, suggested to him that Kelly "better watch [himself] and be very careful[] bcause Bob Miller . . . was after them and their positions."  Id., Exh. 13 (Meeting Summary, prepared by Curtis Thomas).  In December 2007, he maintains, Miller and Hartman made an unannounced

visit to his office, singling the D.C. division out for an audit of its grant-management practices.
Pl.'s Decl., ¶¶ 21-22.

While it is undoubtedly a close question, the Court is ultimately persuaded that Kelly has
provided sufficient evidence for a jury to reasonably determine that his reassignment was
discriminatory and/or retaliatory.  "Credibility determinations, the weighing of the evidence, and
the drawing of legitimate inferences from the facts are jury functions, not those of a judge."
Liberty Lobby, 477 U.S. at 255.  Should the jury, for example, credit Kelly's testimony and
discredit Miller's, it could plausibly find in his favor.  The Court, therefore, will deny DOT's
Motion for Summary Judgment with respect to Kelly's 2008 rating and subsequent involuntary
transfer.

### C.  Implicit Hostile-Work-Environment Claim

Were it not for a single line in Kelly's Opposition to the instant Motion suggesting that he
may have intended to bring a hostile-work-environment claim in addition to his independent
discrimination and retaliation claims, the Court's task would now be at its end.  Neither Kelly's
initial Complaint nor his First Amended Complaint uses the term "hostile work environment" or
in any other way conveys an intention to make out a hostile-work-environment claim.  See
generally Compl.; First Am. Compl.  The Court, accordingly, was as surprised as it imagines
DOT was by the offhand suggestion in Kelly's Opposition that he had made out such a claim.
Specifically, in response to DOT's argument that certain incidents identified in his First
Amended Complaint did not constitute adverse actions, Kelly's Opposition states that he had
"properly listed these issues as part of his hostile environment claim and they are properly
includable in that claim."  Opp. at 23.  He makes no further reference to or argument in support
of a hostile-work-environment claim in his brief.

A complaint need not necessarily use the words "hostile work environment" in order to make out a hostile-work-environment claim. See Steele v. Schafer, 535 F.3d 689, 694 (D.C. Cir. 2008). Indeed, "discrimination" or "retaliation" can "in principle include[] a hostile work environment theory." Id. "[T]he complaint and the evidence of a plaintiff," nevertheless, "must be sufficient to put defendants on notice of any theory of recovery upon which the plaintiff is relying." Overby v. Nat'l Ass'n of Letter Carriers, 595 F.3d 1290, 1297 (D.C. Cir. 2010).

Two cases from our Circuit are directly relevant in determining whether Kelly's First Amended Complaint sufficed to put DOT on notice of a hostile-work-environment claim. On the one hand, in Steele v. Schafer, the panel determined that the plaintiff had raised a claim where 1) his complaint "specifically request[ed his] reassignment 'to a less hostile working environment,'" 2) he "indisputably raise[d] a constructive discharge claim premised on a hostile work environment," 3) the defendant acknowledged and responded to the hostile-work-environment claim in its Motion for Summary Judgment, and 4) the plaintiff defended its claim in its Opposition to that Motion. Id. at 694. On the other hand, in Reshard v. LaHood, 2011 WL 5514009 (D.C. Cir. 2011), the panel distinguished Steele and held that the plaintiff had not made out a claim. In that case, although the plaintiff's Complaint contained "allegations of an 'environment' of 'direct acts of racial discrimination,' an 'environment of professional suppression' and discriminatory conduct 'designed to make plaintiff leave the agency'," which "arguably might have sufficed to place [the defendant] on notice of a hostile work environment claim," the court emphasized that 1), unlike in Steele, the plaintiff had not made a constructive-discharge claim, 2) neither party addressed the claim in its briefs until the plaintiff filed a second motion for reconsideration years after the court's initial summary judgment order, and, relatedly,

3) the defendant was undoubtedly prejudiced by the plaintiff's failure to clearly make out a hostile-work-environment theory.  Id. at *2-3.

Admittedly, this case falls somewhere in between these two markers.  Significantly, however, unlike both Steele and Reshard, the First Amended Complaint contains absolutely no indicia that Kelly intends to invoke a hostile-work-environment theory.  And while the prejudice to DOT is not as extreme here as it was in Reshard, where the eight-year delay left the "evidence . . . stale and memories vague," Kelly's failure to make an explicit hostile-work-environment claim in his pleadings coupled with his failure to make any affirmative argument concerning any such claim in his Opposition deprived DOT of an opportunity to respond to the merits of that claim in their briefs.  The fact that Kelly clearly raised the issue of hostile work environment in his EEOC complaints, moreover, demonstrates that he was aware of the hostile-work-environment theory and suggests his omission of that claim from his pleadings was intentional. The Court simply cannot consider a claim to have been adequately raised based on a single, responsive reference to a "hostile environment claim" in an Opposition to a Motion for Summary Judgment.  It finds, accordingly, no basis to consider an implicit hostile-work-environment claim.

## IV.  Conclusion

For the foregoing reasons, the Court ORDERS that:

1. Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART;

2. The Motion is DENIED as to the involuntary transfer claim;

3. The Motion is GRANTED with respect to all other claims; and

4.  All parties shall appear for a status hearing on January 31, 2012, at 9:30 am in

Courtroom 19.


**SO ORDERED**.


*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  January 12, 2012